# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Case No. 2:12-cr-00237-MMD-CWH |
| vs. ) | **FINDINGS AND RECOMMENDATION** |
| JOSEPH ANDRADE, *et al.*, ) | |
| Defendants. ) | |

This matter is before the Court on Defendant Julian Gaytan's ("Gaytan") Motion to Dismiss All Charges Due to the Government's Bad Faith Destruction of Exculpatory Evidence (#39), filed on October 10, 2012. It is also before the Court on Gaytan's Motion to Suppress Photo Lineup Identification, Any Subsequent In-Court Identification, or for an Order Compelling a Physical Lineup (#40), filed on October 10, 2012. The Court also considered the Government's Response (#48), filed on October 26, 2012, and Gaytan's Reply (#58), filed on November 1, 2012. Additionally, the Court entered an Order (#43) on October 16, 2012 granting Defendant Joseph Andrade's ("Andrade") Motions for Joinder (#41 and #42), filed on October 11, 2012.[1] On January 9, 2013, the Court held an evidentiary hearing (#90).

## BACKGROUND

In the instant case, Defendants Julian Gaytan, Perla Ramirez, David Duran, and Joseph Andrade are charged with (1) Conspiracy to Travel in Interstate Commerce in Furtherance of a Racketeering Activity, in violation of 18 U.S.C. § 371, (2) Brandishing a Firearm in Furtherance of a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2,

---

[1] The Court allowed Andrade's joinder to the motions at issue and provided Andrade with the opportunity to be heard at the evidentiary hearing. However, his due process rights are not implicated because he was not the subject of a photographic lineup.

1  (3) Interstate Travel in Aid of a Racketeering Activity and Aiding and Abetting, in violation of 18
2  U.S.C. §§ 1952(a)(2)(B) and (2), and (4) Brandishing a Firearm During a Crime of Violence and
3  Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. *See* Indictment (#1).
4     The Government alleges that on May 19, 2012, Defendant Perla Ramirez ("Ramirez")
5  knocked on the door of the victim's residence and when the door opened, the three male defendants
6  barged into the home. They proceeded to order everyone to the ground at gunpoint, threatened,
7  assaulted and battered some of the occupants, and stole property from the residence. Ramirez and
8  Andrade were arrested at the scene, but two males fled. In the bed of Andrade's truck, located
9  outside the home, wallets containing the drivers licenses of both Gaytan and David Duran
10 ("Duran") were discovered. Neither Gaytan nor Duran were located at the scene.[2]
11    At the evidentiary hearing on January 9, 2013, North Las Vegas Police Department
12 Detective Edwing Malgarejo ("Malgarejo") testified as to his involvement in this case. He has
13 served 10 years as a detective and has 20 years of law enforcement experience. Malgarejo testified
14 that he was called to the scene of the home invasion on May 19, 2012 to assist with the
15 investigation. A week later, in furtherance of his investigation, Malgarejo asked that two
16 photographic lineups be created by law enforcement personnel. Because Gaytan's and Duran's
17 drivers licenses were found at the scene, an array of six photographs, including Gaytan's drivers
18 license photograph ("the Gaytan array"), and an array of six photographs including Duran's drivers
19 license photograph ("the Duran array") were prepared. All six of the photos for each array fit on
20 one page. Because Gaytan's and Duran's photos were obtained from their drivers license records
21 they had blue backgrounds. The other five photos in the arrays had gray backgrounds. To avoid
22 the obvious color difference, Malgarejo ordered that the photos be printed in grayscale. *See* Govt.'s
23 Exhs 6 and 7 (color); *cf* Govt.'s Exhs 1 and 3 (grayscale). The order of the photos in each array
24 was varied to avoid the possibility of witnesses sharing their identifications based upon location in
25 the array. *See* Govt.'s Exh. 1 (Gaytan's photo in position 5); *cf.* Govt's Exh. 2 (Gaytan's photo in
26 position 4).

27 ―――――――――
28    [2] Duran has been indicted, but not apprehended.

On May 27, 2012, Malgarejo summoned witnesses to the police station and four appeared. Each was brought individually from the station lobby to an interview room where Malgarejo informally advised each of the process that he would use. Each array contained a written notice to witnesses, in English, to place a circle around the number of the person in regards to the crime in question, and to initial the circled number, as well as to make additional comments and sign. Malgarejo did not read the written notice to any of the witnesses. Although Malgarejo maintained no record of the precise advice he gave to each witness, he testified it is his practice to ask witnesses to look at each photo in the array for a person related to the case. He advised them that it is not a problem if they are not sure and they should only identify someone if they are positive. Malgarejo speaks both English and Spanish, and because two of the witnesses are primarily Spanish speakers, he explained the process to them in Spanish. Each witness was provided an opportunity to review the Gaytan array and the Duran array. After viewing the arrays, the witness was returned to the lobby to wait with the others and the next witness was summoned into the interview room. Although the witnesses were told not to discuss their experience, Malgarejo admitted that there was nothing to prevent the witnesses from discussing the identification process as they waited in the lobby. Malgarejo did not maintain any notes of specific comments made by any witness, except what the witness wrote on the bottom of the array. *See, e.g.*, Govt. Exhs 1 and 2 (comments in Spanish).

Witness Jesus Medina ("Medina") identified Gaytan in the Gaytan array and circled the number 5 below the Gaytan photo. He wrote, in Spanish, words that Malgarejo translated as follows: "He put the gun on me, and told me he was going to kill me," and signed and dated the comment 5/27/12 at 10:35 a.m.[3] (Government Exhibit 1). Medina made no identification from the Duran array. Witness Doris Martinez ("Martinez") could not identify anyone from either array as a participant in the offenses. Witness Misael Garcia ("Garcia") chose Gaytan's photo in the Gaytan array and circled the number 4 below the Gaytan photo. He wrote in Spanish words that Malgarejo

---

[3] Malgarejo indicated he did not provide the time that Medina indicated on the form.

1  translated to state: "He was hitting me in the face, and telling me gross things[4] in English," and
2  signed and dated the comment 5/27/12 at 10:35 a.m. (Government Exhibit 2). Garcia made no
3  identification in the Duran array. Finally, witness Yuriana Ramirez ("Yuriana") identified Duran in
4  the Duran array, wrote at the bottom of the form, "He was pointing with a gun and he said that he
5  want to kill him (sic)," and signed and dated the comment 5/27/12 at 10:40 a.m. (Government
6  Exhibit 3). Yuriana identified a person who was not involved in the offense from the Gaytan array,
7  and wrote in English at the bottom of the array, "He was just standing and asking for the money or
8  jewels that we had, and he asked me if I want to die," and signed and dated the comment 5/27/12 at
9  10:43 a.m. (Government Exhibit 4).

10  For each witness, Malgarejo retained copies of each array in which a suspect was identified,
11  but did not retain the Duran and Gaytan arrays presented to Martinez because she did not identify a
12  suspect in either array. Similarly, he did not retain the Duran arrays presented to Medina and
13  Garcia because neither identified a suspect. So, four arrays were not retained by Malgarejo, one
14  depicting Gaytan and three depicting Duran (hereinafter, the "lost photo arrays"). However,
15  Malgarejo memorialized the results of the lineups in his report. (Government Exhibit 5, pages 10-
16  12).

17  Malgarejo testified that he has conducted "hundreds" of photo lineups over 10 years in a
18  manner similar to his method in this case. He indicated that his understanding of normal police
19  procedure was that the arrays in which no identification was made are not retained because they
20  have no evidentiary value. Prior to the evidentiary hearing, but after the photo lineup was
21  conducted, Malgarejo became aware, for the first time, of a policy change for his department.
22  Effective February 2012, the new policy required that lineups not resulting in an identification
23  should be marked with the words "no identification" and preserved. Malgarejo admits he failed to
24  comply with this requirement.
25  In addition to Malgarejo, the Court heard testimony from Detective Jonathan Larson
26  ("Larson") who spoke with the witnesses in an attempt to get a description of the suspects from

---

28  [4] Malgarejo thought this meant he used "vulgar" language.

1  them on May 19, 2012. He was the only officer at the scene who spoke Spanish and understood the
2  suspects to be two Hispanic males in dark clothing. He had no other involvement with the case
3  after clearing the scene.[5]

4  By way of this motion, Gaytan requests two forms of relief: (1) the Court dismiss the
5  charges against him because the Government destroyed photographic evidence in the case and (2)
6  the Court suppress evidence of the photo lineup identification, and any in-court identification, or in
7  the alternative, for an order compelling an in-court physical lineup. Andrade joins the request.
8  Gaytan claims that the failure to retain the "lost photo arrays" violated his due process rights.
9  Additionally, Gaytan moves to suppress the Gaytan photographic array because it is unduly
10 suggestive. The Government argues that the evidence which was not retained was not exculpatory
11 or destroyed in bad faith, and further denies that the arrays are unduly suggestive.

**DISCUSSION**

**A.     Lost Photo Arrays**

Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). This means that the Government must afford criminal defendants "a meaningful opportunity to present a complete defense," which means it must provide an accused with exculpatory evidence. *Id.* There is a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense." *Id.* at 488. To meet this standard of constitutional materiality, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that

---

[5] At the evidentiary hearing, Defense Counsel sought to introduce testimony from Kenneth Hardy ("Hardy"), who is a retired Las Vegas Metropolitan Police Department ("Metro") homicide detective, regarding best practices and industry standard to demonstrate bad faith. The Government objected as to Hardy's qualifications as an expert and his CV was not provided as part of the joint discovery agreement nor was notice provided that he would testify as an expert at the hearing. The Court found that Hardy's testimony should be excluded from the evidentiary hearing because his testimony would not be helpful to the trier of fact in determining the exculpatory value of the evidence and whether it can be obtained through comparable means. He is a former Metro officer while this case involved North Las Vegas Police Department procedures. Additionally, his testimony was excluded based on Fed. R. Evid. 403 as cumulative and not relevant under Fed. R. Evid. 704. The Court notes that Defense Counsel reserved the right to call him at trial.

the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. The "mere possibility" that the lost or destroyed evidence is exculpatory does not meet the materiality standard. *United States v. Agurs*, 427 U.S. 97, 109 (1976). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Moreover, the Court held in *Arizona v. Youngblood*, 488 U.S. 51 (1988), that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. *See also, Featherstone v. Estelle*, 948 F.2d 1497, 1504 (9th Cir. 1991) (destruction of photo lineup not a denial of due process because it was not exculpatory and not prejudicial for several reasons).

Gaytan contends that the loss of four of the lineups constitutes a violation of his due process rights. He argues that the lost evidence was exculpatory and useful because he cannot know why an identification was not made nor have access to inconsistent suspect descriptions without this evidence. Moreover, he contends that it is critical evidence because there is very little evidence tying him to the charged offenses besides eyewitness identifications.

### 1.  **Gaytan Array**

Martinez failed to identify a suspect from the Gaytan photo array and that specific array was not retained. The Court is not persuaded that the lost Gaytan array itself plays a "significant role" in Gaytan's defense. *Trombetta*, 467 U.S. at 488. The exculpatory evidence is the fact that Martinez did not identify Gaytan rather than the photo array itself. That exculpatory fact was provided to the defense and is available for its use. *See* Govt. Exh. 5, 10. Had Malgarejo retained the Gaytan array that was shown to Martinez as is required by current police policy, it would only have been annotated that no identification was made. There is not a "reasonable probability" that the presentation of this missing array would undermine the outcome of this case. *Bagley*, 473 U.S. at 682; *see Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (the lost evidence was irrelevant because the victim failed to identify anyone in the lineup; the lost evidence was not exculpatory making *Brady* inapplicable and not "potentially useful" making *Youngblood*

inapplicable).  Moreover, evidence comparable to the missing array is available.  According to Malgarejo, the missing Gaytan array had the same six photographs on it as the other Gaytan arrays (i.e., Govt. Exhs 1 and 2), just in a different order.  Gaytan may present this comparable evidence if he deems it important to his case.

Alternatively, even if the lost photo array is assumed to be exculpatory, there is no evidence that its destruction was in bad faith.  Malgarejo credibly testified that he did not retain the lost photo array because he believed it had no evidentiary value.  He testified that he discarded it pursuant to the normal procedure for "hundreds" of photo lineups that he conducted over many years.  At the time of the lineup, he was not aware of the change to the new police policy that required that the array be retained and marked "no identification made."  There is no basis to demonstrate "bad faith," and in the absence of bad faith, failure to preserve the arrays does not constitute a denial of due process.  *See Youngblood,* 488 U.S. at 58; *see also, Estelle*, 948 F.2d at1505 (police officer did not preserve the photo because he mistakenly believed it was not useful identification evidence); *see also Goldsmith*, 878 F.2d at 323 (same).

**2.      Duran Array**

Medina, Martinez, and Garcia did not identify Duran after reviewing the Duran photo arrays and those three arrays were not retained by Malgarejo.  Gaytan's claim that the lost Duran photo arrays violate his due process rights is not persuasive.  The failure to identify Duran is not exculpatory to Gaytan because it would not play a "significant role" in his defense.  *Trombetta*, 467 U.S. at 488.  Similarly, the failure to identify Duran is not exculpatory to Andrade because he has failed to establish how it would play a "significant role" in his defense.  *Id.*

Even assuming the witnesses' failure to identify Duran is relevant, for example, to impeach Medina and Garcia's identifications of Gaytan, Gaytan could present comparable evidence through the testimony of Malgarejo.  Gaytan alleges that he needed the lost arrays to compare the persons included in the photo arrays that resulted in no identification with the arrays where an identification was made.  However, the Malgarejo testified that the same photos were used in the arrays prepared for each defendant.  Loss of the "no identification" Duran arrays does not prevent Gaytan from arguing about the result of the arrays.  As a result, this situation is distinguishable from *United*

7

*States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), in which the Ninth Circuit found the government's bad faith failure to preserve laboratory equipment violated due process. Here, the lost arrays are not exculpatory and comparable evidence can be procured.

Finally, similar to the lost Gaytan array, there is no evidence of bad faith in the failure to retain the lost Duran arrays. As discussed above, Malgarejo testified that he destroyed the three Duran arrays that resulted in no identification as he did all other no identification arrays until becoming informed of the new policy. Gaytan argues that Malgarejo was aware of the paucity of evidence tying him to the crime other than eyewitness identifications and therefore any "no identification" from a lineup would be exculpatory. The Court is not persuaded that a witness' failure to identify a suspect is exculpatory merely because a witness' identification is inculpatory evidence. *See Goldsmith*, 878 F.2d at 322 (finding the lost evidence irrelevant because the victim failed to identify anyone in the lineup and therefore not exculpatory). Moreover, Gaytan failed to prove that Malgarejo acted with a bad faith intent to destroy the three lost Duran photo arrays. Malgarejo credibility testified that he only disregarded them because he did not for all no identification arrays for years. There was no evidence presented that Malgarejo deliberately destroyed the arrays to deprive Gaytan of access to relevant information. Accordingly, Defendants have failed to prove that the four lost photo arrays violate their due process rights and should result in dismissal of the indictment or suppression of evidence.

### B. Unduly Suggestive Lineup

The Ninth Circuit has approved the use of photographic lineup in identifying suspects. *See e.g., United States v. Barrett*, 703 F.2d 1076, 1084-85 (9th Cir. 1983); *United States v. Collins*, 559 F.2d 561, 563 (9th Cir. 1977). It is not the use of photographic lineups, but the likelihood of misidentification, which violates a defendant's right to due process. *See Neil v. Biggers*, 409 U.S. 188, 198 (U.S. 1972). Suggestive confrontations are disapproved because they increase the likelihood of misidentification. Unnecessarily suggestive lineups are condemned for the further reason that the increased chance of misidentification is gratuitous. *Id*. To determine whether the challenged identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification, the Court must examine the totality of the surrounding

circumstances. *See Simmons v. United States*, 390 U.S. 377, 384 (1968).

The Court employs a two step analysis to determine the admissibility of identification testimony. *Biggers*, 409 U.S. at 198-99. First, the defendant must prove that the identification was impermissibly suggestive. *Id*. If the challenged procedure is not impermissibly suggestive, then the court's inquiry into the due process claim ends. *See United State v. Davenport*, 753 F.2d 1460, 1463 and fn. 2 (9th Cir. 1985); *United States v. Love*, 746 F.2d 477, 479 (9th Cir. 1984) (same). If the identification procedure is impermissibly suggestive, then the court considers whether the testimony is nonetheless reliable using five factors. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199-200. Against these factors, the court should weigh the corrupting effect of the suggestive identification itself. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Gaytan argues that the photographic lineup is unduly suggestive for several reasons. First, any difference in the complexions of the people in the lineup is masked by the blue background. Second, his photo is of higher resolution. Third, he is the only person in the lineup with a distinctively shaped straight hairline, distinctive eyebrows, and wide nostrils.

### 1.     **Impermissibly Suggestive**

Gaytan's photograph appears to have a slightly better focus than some, but not all, of the other photos (Govt. Exh. 1, compare #5 with #2 and #3), and the light reflection on Gaytan's face seems to be slightly different than some, but not all, of the other photos (Govt. Exh. 1, compare #5 with #4 and #6). Viewing the actual arrays shown to Medina and Garcia, all of the Gaytan fillers appear to be of Hispanic descent, the same age, and have similar complexion, facial hair, hair color and length. Of course, people are different, and so hairline, nose shape, eyebrows, are all distinctive, but the same argument of distinctiveness could be made for each of the fillers. None of these distinctive features unreasonably highlights Gaytan. Indeed, the Ninth Circuit has rejected similar claims involving lineups where the defendant looked fairly similar to others in the lineup. *See, e.g., United States v. Barrett*, 703 F.2d 1076, 1084-85 (9th Cir. 1983); *United States v. Collins*,

1   559 F.2d 561, 563 (9th Cir. 1977), *Goldsmith*, 878 F.2d at 323(various background colors among
2   the photographs do not make the lineup unduly suggestive).
3         Moreover, it does not appear that the photographs are unduly suggestive because one
4   witness, who was present during the home invasion, did not identify Gaytan and another witness
5   identified a person other than Gaytan.  Had the array been unduly suggestive, then witnesses who
6   were uncertain would nevertheless have identified Gaytan.  Also, this situation is unlike that in
7   *Foster v. California*, 394 U.S. 440 (1969), in which petitioner was first placed in a lineup with
8   considerably shorter men and then was the only man to be again placed in a subsequent lineup.
9   Here, the filler photos were consistent in all of the Gaytan arrays.  Accordingly, the Court finds that
10  the photo lineup did not lead to a "very substantial likelihood" of misidentification, *Biggers*, 409
11  U.S. at 198, nor did it focus on any single individual, *Simmons,* 390 U.S. at 382-83.  The Court is
12  not convinced that Malgarejo's decision not to show photo arrays to two witnesses makes the lineup
13  unduly suggestive.  Malgarejo testified that he asked all six witnesses to come to the station for the
14  lineups, but two failed to show up.  Therefore, Gaytan's lineup was not impermissibly suggestive.

      **2.**      **Reliability**

16        Even if the lineup was taken to be impermissibly suggestive because of the higher resolution
17  of Gaytan's photo or light reflection on the faces, the Court would still find that the five indicia of
18  reliability are met.  Both Medina and Garcia identified Gaytan as the suspect.  Medina commented
19  that Gaytan was the person who "put a gun on me, and told me he was going to kill me."  Garcia
20  indicated that "he was hitting me in the face, and telling me gross things in English."  It appears that
21  both witnesses were in close proximity to, had a sufficient opportunity to view the suspects at these
22  moments, and that their degree of attention was sufficient.  *See, Goldsmith*, at 323 (finding
23  sufficient degree of attention when victim observed the defendant in adequate lighting and in close
24  proximity for several minutes).  Although Gaytan suggests that reliability is questionable because
25  the witnesses were under stress and focused on a firearm when seeing the subjects, the Court finds
26  that these circumstances are not enough alone, to make the identification unreliable.  In fact, the
27  home invasion robbery took place over several minutes, in a home that was lit compared to outside,
28  and with firearms present.

1    Regarding the accuracy of the prior description given, Medina provided a statement in
2    Spanish indicating that he "did not look at [the suspects] very well, that they were average height,
3    dark-skinned, or light dark-skinned;[6] one of them spoke in Spanish and the other two in English."
4    Garcia's statement did not contain a description of the suspects.[7] Medina's statement that he did
5    not look at the suspects very well indicates uncertainty in his identification and his description of
6    the suspects is not particularly useful. Because the grayscale skin coloration of each of the fillers in
7    the array is similar and neither height nor language spoken is evident from the photographs,
8    Medina's prior description does not rule out a particular suspect in the array.
9    Finally, the length of time between the robbery and the identification was seven days. The
10   Court finds that this is not an unreasonably long period of time. *See United States v. Barrett*, 703
11   F.2d 1076, 1085 (9th Cir. 1983) (finding two weeks was not unreasonably long). Balancing the
12   indicators of Medina's and Garcia's ability to make an accurate identification with the "corrupting
13   effect of the challenged identification," namely, the insignificant resolution and lighting of the
14   photographs, the Court finds that neither witness acquiesced in the minimally suggestive nature of
15   the photographs when they identified Gaytan. *Brathwaite*, 432 U.S. at 114. Therefore, the Court
16   finds that the photo lineup are not unnecessarily suggestive and declines to suppress them.

### C.   Prohibition of In-Court Identification

18   Gaytan also argues, citing *United States v. Field*, 625 F.2d. 862 (9th Cir. 1980), that the
19   improper identification procedures, that is, the unduly suggestive pretrial lineup, was so prejudicial
20   that they taint any in-court identification. As discussed above, in reviewing pretrial procedures for

---

[6] Medina's translated statement includes a note that the suspect's skin color was "moreno," or dark, in one portion of his statement and "moreno claro," or light dark, in another. Larson testified about this alleged inconsistency at the hearing. He speaks Spanish and spoke with the witnesses at the scene on May 19, 2012. Larson testified that the written description of "moreno" and "moreno claro" was confusing and he was not sure whether the description referred to one person or two. Of course, the ambiguity of the description is available for Gaytan's use at trial, for example, to impeach Medina's identification. However, it does not establish that the photo lineup was unduly suggestive or that Medina's identification was tainted by the suggestive nature of the Gaytan photograph.

[7] Translations of these statements were provided to the Court post-hearing.

such taint, "each case must be considered on its own facts." *Simmons*, 390 U.S. at 384 (1968). A conviction based on an in-court identification at trial subsequent to a pretrial photograph identification will only be set aside if the pretrial photograph identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.*; *see also, Field*, 625 F.2d at 865.

The Court has already determined that the photo lineup was not unduly suggestive and Medina's and Garcia's identifications were not the result of the minimally suggestive nature of the photographs. As a result, there is no basis to conclude that the in-court identification of Defendants, if any occur, will carry a substantial likelihood of irreparable misidentification. Nevertheless, the Court will address the irregularities that Gaytan identified in the lineup process. Gaytan argues that both Medina and Garcia could not have made their identification at 10:35 am, as recorded on the array. *See* Govt. Exhs 1 and 2. However, Malgarejo testified that the witnesses, not he, determined and wrote the time of the statement. Therefore, the time discrepancy is not a significant irregularity. Gaytan also highlights the fact that the written notice at the top of the arrays was not read verbatim to the witnesses in their native language. However, Malgarejo described the advice he gave to each witness and it was not significantly different from the written notice. Finally, Gaytan points out that Malgarejo did not memorialize the specific utterances of the witnesses made during the lineup. However, the witnesses who identified a suspect wrote their comments on the form. So, the identifications made were clearly supported by a statement from the witness. For these reasons, the Court finds that the irregularities identified by Gaytan do not taint the actual identifications made by Medina and Garcia as they do not give rise to a very substantial likelihood of irreparable misidentification. Moreover, this case is easily distinguishable from *Field*, 625 F.2d 862, as that case involved suggestive conduct by the FBI agent in telling a witness that his selection of a photograph who was not the defendant was wrong. Here, Malgarejo did not ask the witnesses further questions when they made no identification in four of the lineups.

### D. Request for Pre-Trial Physical Lineup

Finally, Gaytan argues that a physical lineup prior to trial is necessary to ensure he receives a fair trial. *See Evans v. Superior Court*, 11 Cal.3d 617 (Cal. 1974). Because the Court has

determined that the photographic lineup was not unduly suggestive and the identifications by Medina and Garcia were not the result of the suggestive nature of the photographs, there is no basis to order a pretrial physical lineup. Additionally, Gaytan has failed to demonstrate that a new lineup, this remote in time from the May 19, 2012 home invasion, would resolve a possible mistaken identification.

Based on the foregoing and good cause appearing therefore,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant Julian Gaytan's Motion to Dismiss for the Government's Bad Faith Destruction of Exculpatory Evidence (#39) and Gaytan's Motion to Suppress Photo Lineup Identification (#40), which are joined by Defendant Joseph Andrade (#43), be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 5th day of April, 2013.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**